HERMAN KUFS (ALIAS JACK KUFS) V. THE STATE.

No. 19079. Delivered June 16, 1937.
Rehearing Denied November 17, 1937.

The opinion states the case.

*Howth, Adams & Hart* and *Mike Daughtry,* all of Beaumont, and *Xavier Christ,* of Port Arthur, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

CHRISTIAN, JUDGE.—The offense is murder; the punishment, confinement in the penitentiary for life.

It was charged in the indictment, in substance, that appellant, with malice aforethought, killed Clarence R. Kingsley by striking, hitting and beating him with a blackjack.

The homicide occurred on the 28th of November, 1936, in the Elks Club building in Port Arthur, Texas. The testimony on the part of the State was sufficient to show that appellant, who was a member of the club, went into the building at night and beat the deceased to death with a blackjack. Moreover, the State's testimony was to the effect that the homicide was committed in the perpetration of robbery. It appears that deceased was in charge of the building on the occasion of the homicide and had in his possession money belonging to the club. The proof was sufficient to show that appellant was in possession of some of this money shortly after the homicide.

Appellant testified that he went to the club at night on the occasion in question for the purpose of engaging deceased in a game of dominoes; that deceased finally decided not to play; that in a friendly way he told deceased he was afraid that he (appellant) would beat him; that finally deceased said that he was prepared to close the building and go home; that he jokingly told deceased that he (appellant) was going to remain in the building; that deceased came out from behind the bar and told him that he was going to run him off; that he thought deceased was joking; that he told deceased he was not going to leave; that deceased struck at him and shoved him against a "shine" stand; that he tried to hold deceased, but that deceased

hit him in the mouth and broke his false teeth. At this juncture we quote from the testimony of appellant as follows:

"Of course, I got mad then, too, and I was trying to hold him off from me and trying to get away from him, but I seen I couldn't. He got hold of me and I thought he had gone crazy or something, so I tried to get him away from me, and I finally got the blackjack, thought I would hit him one time and get away from him, and I did, and started out of that buffet door and, of course, he followed me out there. By that, I guess we both lost our heads. He struck the first blow. It was severe. It burst my teeth. Naturally it made me mad. I knew he was mad then too and I just figured I was going to have to get out from under him. It produced an excited condition of mind, naturally, and anger. After the fight started, why I got outside that door, he just kept coming all the time. * * * I was trying to get out from under him. He kept coming down. The assault upon me was violent. He was mad. * * * I didn't go there to kill that old man and to rob him of a few dollars. * * * I quit fighting when he did."

Appellant's testimony was to the further effect that he and deceased had been good friends. Again, he testified that his salary was one hundred fifty dollars a month and that he had no dependents, and that he only owed two or three hundred dollars. He said: "My creditors were not pressing me in any way. I always could borrow money whenever I needed it."

The court charged on murder with and without malice, and also submitted an instruction covering the law of aggravated assault. Again, an instruction was submitted according appellant the perfect right of self defense. In submitting the case from the standpoint of the State, the court instructed the jury, in substance, that they must believe beyond a reasonable doubt that appellant was actuated by malice aforethought and had the intent to kill the deceased before he could be convicted of murder. Stated in another way, in the charges submitting murder with malice and murder without malice from the standpoint of the State, the court required the jury to believe beyond a reasonable doubt that appellant entertained the intent to kill deceased.

Appellant objected to the charge as follows:

"Defendant excepts to the charge of the court because the court in its charge fails to instruct the jury that before they would be justified in convicting the defendant of either murder with malice or murder without malice they, the jury, must first find and believe beyond a reasonable doubt that the defendant

entertained the specific intent to kill the deceased, for the reason that the weapon which was used by defendant is not a deadly weapon per se."

In view of the fact that the trial judge had required the jury to believe beyond a reasonable doubt that appellant had the intent to kill before they could convict him of murder, we are of opinion that the exception was not sufficiently specific to apprise him that appellant desired that he single out the question of intent to kill and submit the matter as an affirmative defense. It might be added that, although appellant testified that he did not go to the Elks building for the purpose of robbing and killing deceased, he at no place in his testimony specifically stated that he had no intent to kill deceased after deceased had attacked him. It is true he said he quit fighting when deceased did, but at that time the head of deceased had been beaten into a pulp and he was lying on the floor dead. In the state of the record we think reversible error is not presented.

Appellant objected to the charge of the court for its failure to define negligent homicide. The evidence failed to raise the issue. It is appellant's contention that the charge should have been given because the court, in submitting an abstract definition of murder in his charge, used language as follows: "Murder is distinguishable from every other species of homicide by the absence of circumstances which reduce the offense to negligent homicide or which excuse or justify the killing." We think appellant's position is untenable.

It is shown in bill of exception No. 1, that, in response to questions by the district attorney, N. B. Wofford, a' witness for the State, testified as follows: "He (defendant, Herman Kufs) said he couldn't go home, said there was a party in his room, he couldn't get in, he was locked out, said a man had a woman in his room." Appellant's objection to this testimony was sustained and the jury were instructed not to consider it for any purpose. It appears that appellant went to his work at about 6 a. m. It was the State's theory, given support in the testimony, that prior to the homicide appellant had been "sweating" poker games in the Elks building practically all night for the purpose of finding out the amount of money that would be placed in the safe. In short, it was the State's theory that, notwithstanding appellant's duties required him to be at work at the time mentioned, he remained away from his room without sleep in order to acquaint himself with conditions at the club prior to the robbery. Prior to giving the testimony in question the witness Wofford testified, in part, as follows: "He (refer-

ring to appellant) stayed there all night sometimes sweating this poker game or watching it. Jack Kufs (appellant) would come into the buffet room, a room adjoining the card room, he would come in, watch the poker game, walk back out and sit down and talk to me. I would ask him why he didn't go home. He would offer some excuse for not going, and he would just sit there, he would sit there from 5 to 5:30 in the morning. He did it three times a week, including November 28, there, three times during that week. We had that big game going on during those three days he was there. He stayed up there all night one night during that week. He did nothing. I didn't ask him to stay up there. I asked him why he didn't go home." It was after the witness had given the foregoing testimony that the State elicited from him the fact that on one occasion appellant offered as an excuse for not going home the fact that a man had a woman in his room and that he was locked out. We think it is manifest that the jury could not have gotten the impression that it was the State's position that a man and woman were in fact in appellant's room. On the contrary, from the testimony above set forth, it seems clear that it was the State's position that the excuses appellant was offering for remaining in the club house practically all night on the occasion of the poker games were not well founded. In the state of the record we are unable to reach the conclusion that the testimony shown in the bill of exception was calculated to lead the jury to believe that appellant was permitting his room to be used for immoral purposes. It follows that we are of opinion that the bill of exception fails to reflect reversible error.

In his argument to the jury counsel for the State used language as follows: "I hope you go out there thinking carefully and seriously, praying to God if you have to, but remember the words of those witnesses and if they don't correspond identically with the concrete mass of facts linking this man with this crime, then turn him loose on this community, and if they do, let him take his medicine." Appellant objected to said argument on the ground that it indicated that he would be subjected to mob violence if the jury acquitted him. We do not so interpret the remarks of counsel for the State. He merely requested the jury, in effect, to convict appellant if the testimony of the witnesses corresponded with "the concrete mass of facts" showing appellant's guilt. On the other hand, he told them, in substance, that if the testimony did not show appellant's guilt to acquit him. We think the bill fails to reflect error.

An examination of the other bills of exception complaining

of argument by counsel for the State leads us to the conclusion that reversible error is not shown by said bills.

The judgment is affirmed.

*Affirmed.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

### ON MOTION FOR REHEARING.

MORROW, PRESIDING JUDGE.—We have carefully re-examined the record in the light of the appellant's motion for rehearing and are constrained to conclude that the rights of the appellant were fully presented and considered in the original opinion in which the conclusion is expressed that the evidence supports the verdict of the jury that the appellant was guilty of murder with malice.

The motion for rehearing is overruled.

*Overruled.*